Good morning, Your Honor. Rockley Kerbel-Shvili. May it please the Court, I will be appearing for Appellant Rodney Green, Sr., and I would like to reserve three minutes for rebuttal, if I may, and I'll watch the court. Thank you. I would like to address two points here today. Defendants were not entitled to summary judgment because there is, in fact, a genuine dispute of material facts. And the second point I would like to address to the Court today is that even if defendants were entitled to summary judgment, defendants were not entitled to recover their costs. And really, the reason for this is that this case was never meritless, frivolous, or without foundation. Now, with regard to the first point I just made, plaintiff brought various specific independent claims under the Fair Housing Act. And there's really two specific claims that I want to discuss with you today. Now, the first claim is the issue of accessible parking. Now, the Court, when it ruled as it did, it stated that there's no genuine dispute that Mercy Housing, the appellees in this case, did not fail to provide an accessible parking, that they basically did everything they had to do under the Fair Housing Act. And we believe that is something that the Court got wrong, and there is an actual genuine dispute as to whether or not the appellees did do everything they needed to do. And here's really why. Now, when the appellant moved into the premises, he requested a space that would be accessible. And this is clear in the summary judgment record, because this isn't just something that Mr. Green, the plaintiff in this case, stated in his declaration. It was also admitted by the declarant for Mercy Housing, their agent. And she says explicitly in her declaration, now look, he requested an accessible space. So that's not really an issue. And after he requested an accessible space, it's clear that the space that he requested, the parking spaces, they were not accessible. And he also makes this clear in his declaration. He states, look, I had these spaces. I needed an accessible space because I have mobility disabilities, and I was too far away from my unit. So I couldn't, the space that I had,  And also in his declaration, he also explains how one of the spaces was actually constructed incorrectly, and he actually was injured. So what the court did was it just basically stated that, well, that's fine. What they gave Mr. Green is enough because Mr. Green requested a space at this daycare. And there's really- I'm sorry, I didn't hear it. Because Mr. Green requested what? The court basically said that Mercy Housing did everything they needed because Mr. Green asked for a space at a daycare. And what this daycare is, is basically Mercy Housing owns the premises, or at least the parking facility, but they leased it out, the parking facility, to a daycare. Well, I understand he asked for that. It's that, and this is what I wanted to get into. He pointed to that, or somebody pointed to it as a possibility. I guess the point was that he, or maybe his son had parked in those spaces. I couldn't tell. At one point it says he parked, but the car that was towed seems to have been his son's car, but somebody parked there. And so now you're saying, more evidently in your reply brief than in your opening brief, that, oh, but really a pertinent space would have been the one, one of the guest spaces at the visitor center or the office of the housing facility. Certainly. So what I'm saying is that first, Mr. Green, none of these five depositions that he sat through, did he ever state that, look, I demand an accessible space at the daycare? He never said that. What was- Did he ever mention the visitor center spaces? He mentioned it in the sense that there's two areas in the record. First, he complained, when he complained to the Department of Fair Employment, he did say that, look, I am, the parking I'm given is not accessible. And I need something different, something more accessible. And it is in the record. It said, I believe it's ER 837 and 841. That's the DFVH document. So, but what the court did was basically, it concluded that Mr. Green requested a space and he demanded a space at his daycare. And he never did that. How the court reached this conclusion is by just looking at the declarations, actually a declaration submitted by Mercy Housing's agent. But putting all that aside, Your Honor, this isn't really the issue. Our contention is that even if Mr. Green requested an accessible space, that doesn't basically discharge, or it doesn't mean that Mercy Housing did everything they needed to do under the Fair Housing Act. It doesn't mean that- That depends. I mean, the problem is that the record is very undeveloped with regard to any spaces other than the daycare center spaces. So, you can't really tell from the map where these visitor center spaces are and why. And there's never been any response that I know of from Mercy Housing. And maybe this is their problem as to why he couldn't park in those spaces. But it's very mushy. Oh, right. And I agree with- Because there's no focus on it. Right. And so, but there's a thing. In the declaration submitted by Mercy Housing, it explicitly states in the Evelyn Singh declaration, I believe it's paragraph 29. And she actually states that, look, there are guest parking. There's guest parking, but it's for guests only. Or there's parking at the guest services, I believe is what she calls it. And it's for guests only. It's short-term parking only. And she also mentions that there is, they call it handicapped spaces, but ADA designated spaces at these premises as well. But there is a dispute actually as to whether or not these spaces were ever, if Mr. Green was ever allowed to even park at these spaces. Because in his deposition, he actually stated that, look, yes, there were these ADA accessible spaces. And he implies that they would actually accommodate his disabilities. But Ms. Singh told him that she, he's not allowed to park there because it's only for visitors. And it's not for tenants. But the point I'm trying to make here, Your Honor, is that even if, let's say Mercy Housing, let's say Mr. Green said, I want a space, explicitly said, I want a space at the daycare. That's the most convenient. That's not enough to satisfy Mercy Housing's obligations under the Fair Housing Act. And what I'm trying to say here is that under Jankowski-Lee versus Cinceros, that's a Seventh Circuit case. That's 91 F. 3rd 891. The court explicitly said, and I quote, if a landlord is skeptical of a tenant's alleged disability or the landlord's ability to provide an accommodation, it is incumbent upon the landlord to request, document, or open a dialogue. Now, there was never any discussions in this case, Your Honor, with Mr. Green that, okay, we can't give you the space at the daycare. Let's give you something else. What is clear in the record is that he kept struggling to park and he was parking at different locations, locations he found important. Is that essentially an interactive process claim? It is not. And that's what I would like to clarify because this court, about two weeks ago, an opinion came down, HMK, I believe, or Glenn Howard versus HMK. And there, the court said that, look, there is no independent claims for interactive process. And we're not saying that there was no interactive process. And in fact, in that case, the court distinguished that case with a Jankowski that I just cited, Jankowski versus Cisneros, because Jankowski versus Cisneros does not use interactive process. It just says that there needs to be a dialogue. And I think the idea is that once it's obvious to a reasonable landlord that an individual needs an accommodation, it's incumbent upon them to get into a dialogue. So what Mercy Housing should- I have a little, I have a really hard time seeing the difference between an interactive process and getting into a dialogue. Well, no, I mean, what I'm saying is that they, the court, this court, Ninth Circuit just said they don't even use the phrase interactive process. And that's, they don't. But in the HMK case, the court was basically saying you are seeking an independent violation or lack of an interactive process. And we're not asking for, we're not saying that there was an independent violation. What we're saying is that at the summary judgment stage, because there was no dialogue, there is a genuine dispute to say as to whether or not Mercy Housing under these circumstances did everything they needed to do. Because they did not discuss everything. They did not discuss anything with Mr. Green. They just gave him the spots. He requested, he said, I need an accessible space. They assigned a couple of spaces to his family, him and his two sons. And that was it. And then Mercy Housing knew well that he wasn't- Did he ever go and say, this space isn't working for me, I need a different space? He had multiple interactions with Evelyn saying about it. Because she kept telling him that, she kept putting notices, notice violations that kept telling him and sending out letters and posting notices on their vehicles that, look, you can't park here, you can't park here. And it's not that he wanted to park in those other spaces. He needed to because the other ones that were given were not accessible to him. So that's really the issue. It wasn't even his car that was being- What was that? It wasn't his car that was being tagged a lot of the time. Yeah, well, it wasn't, no, it wasn't his car. I think it was primarily, it was primarily his children's cars, but he did state in his deposition that I, when I would, I think he basically said, when I would come to the premises, I would return home at night, I would try to park in front of my unit. So, and the reason for that really is that because the spaces he had were not accessible to him. It's not that he didn't want to follow the rules. He'd gladly want to follow the rules, but what he wanted was to be given a space that was accessible. And there's actually numerous options that they could have done here under these circumstances. And first, they could have turned the visitor parking into a permanent spot for him. They could have clearly allowed him to have this ADA accessible space permanently because they're nearby the other spaces, but they're constructed in a way that he could use it easier. And there's even one case, I believe it's the case of Shapiro versus Cadman Towers. That's a second circuit case, 51 F third 328. And in that case, the court even says that, look, under certain circumstances, you can even give up another employee's, an employee's space, an employee that works at a housing complex, their space could be given up for a disabled tenant space. And they even mentioned, although they did not go into it, they even mentioned that, they said that it's worth considering whether or not under certain circumstances, another tenant space that is not disabled could be given up for a disabled tenant space. So what I'm trying to get out of here, your honor, is that there are actually legitimate questions as to whether or not Mercy Housing could have done something else, and it was required to do something else. And do you want to address any of the other claims quickly? Oh, yes, definitely. I want to, I- Either with respect to Elijah or with respect to the race discrimination issue or with respect to the cost thing, but the cost thing is a pure legal issue, so I think it's- Yes, so quickly, we'll discuss the racial discrimination. Now, the issue of racial discrimination, the court incorrectly focused, we believe here, on the ultimate eviction, because the issue here is not the ultimate eviction. We don't challenge the ultimate eviction. It's clear in the record that after the rent went up, he was not able to pay. What we're challenging is what was happening while he was living there, and what was happening is that despite him repeatedly paying the rent on time, they were serving these notices on him, basically saying, you're not paying the rent, you're not paying the rent, you're not paying the rent, despite him- Well, my understanding is that he wasn't paying, he wasn't paying the rent on time. He was paying it within, or close to within, the grace period. Yes, and the court actually says in its order, it says specifically between January 2017 and June 18, say for one instant, plaintiff paid his rent on time, as, or paid his rent within the grace period as allowed by the lease. So he was paying the rent on time, but he was still getting these notices, and the issue of summary judgment was really that the evidence that he provided was hearsay, but even without this hearsay evidence, when you take the racist statements and you combine it with these never-ending notices, I think there's a genuine dispute as to whether or not there was any racial animus towards Mr. Green, because if you're forcing him to pay, you're doing these notices saying, you gotta pay the rent on time, despite him actually paying it on time. Could those statements have been admissible at trial, I think is the question, and arguably they could, because Singh was representing Mercy Hospital, so they would have been omissions. Absolutely, Your Honor. I think that's not an issue, and I'd like to just point out before my time runs out, the court would not rely on our hearsay evidence, but the court had no problem really relying on the hearsay evidence brought in by Mercy Housing, and that is the- But the problem with the notices is we have no idea whether this was just a routine thing they did, i.e., any time somebody didn't pay on a date, they issued a notice, or whether they did it just for him. Do we know that? Well, we know it from his declaration, where he says that other people that were not, were tenants there, but were not African-American, were subject to a different- But that's the kind of evidence that doesn't work. I mean, there's a lot of discussion about self-serving declarations, and when the self-serving declaration is about you, that's fine, but it's about something else you don't say how you know, that isn't worth anything. I mean, he doesn't say who, he doesn't say why, he doesn't say how he knows. No, well, he did say that he spoke to other tenants and what exactly they told him, and that's the declaration from Evelyn saying is the same level of hearsay. She, regarding his son's alleged illegal activity is just statements from other people. Right. All right, thank you, counsel. Ms. Yunkin. Good morning, Your Honor. May it please the court. Michelle Yunkin on behalf of the Mercy Housing Appellees. Your Honor, this morning, appellees asked this court to affirm the district court's order granting summary judgment in their favor, and further asked this court to affirm the order awarding costs. The district court correctly determined based on the admissible evidence that no genuine issue of material fact existed for determination by a jury. In doing so, the district court correctly exercised its discretion under Rule 56D to decline appellant's request for a continuance to pursue additional discovery and properly denied appellant's late filed discovery motion as moot, neither are reversible error. My opponent focused on the reasonable accommodation issue with respect to accessible parking. So if it please the court, I will address that issue first. It is demonstrable and undisputed that before Mr. Green and his two co-tenant sons leased unit 103B at the East Leland Court Apartments, Ms. Singh walked the property with them and showed them all three parking spaces, 141, 31, and 136. She showed them the parking spaces also in relation to unit 103B so that Mr. Green could see where he would be parking and where his sons would be parking. That is undisputed. Mr. Green does not even dispute that in a self-serving. Because he has a contractual barge or any claim there or what? Your Honor, it begins the dialogue about Mr. Green's requesting an accessible parking space and his seeing and viewing the parking spaces that were in fact made available to him upon the beginning of his tenancy. The later argument that the spot was not accessible is then called into question because he viewed spots first. Additionally- I didn't actually see anything. You might look at something and say, oh, that's not so far away. And then you start doing and he claimed, he says in particular that there was some concrete barrier on one of the spots that made it difficult to navigate with his cane and he wouldn't have noticed that originally. The curb, Your Honor. Yes. But in that regard, again, he had spot 141 and 136 as well as the two disabled spaces, the spaces reserved for persons with mobility disabilities in the same line, in the same row of spaces. He says, now I don't remember seeing that, but I have to look. But he, Mr. Karbalesh really says that Mr. Green says he was told he couldn't use those. Well, that is because resident parking is assigned at this property, Your Honor. It doesn't matter if there was accessible, other handicapped parking. Well, he certainly could have used them, Your Honor, in the event that, for example, one of his sons parked their cars in the closer spots to the unit. For example. But he couldn't use it in general, so it's sort of irrelevant. Nevertheless, both spots 136 and 141 were the closest available parking spots to his unit. And it is also undisputed that no other spots became available during the course of Mr. Green's 22-month tenancy. What about the visitor spaces? Or what about letting him use one of the, I mean, the basic argument is, the district court only focused on these daycare spaces. And even agreeing that it was not reasonable to ask Mercy Housing to let him use the daycare spaces, there were other spaces that could have been considered and were. I understand the argument, Your Honor. Thank you. There is no evidence in the record that Mr. Green asked Mercy Housing to use the visitor parking. That request was made exclusively to the DFEH. The communication to the DFEH does not constitute notice to Mercy Housing that that is something that Mr. Green wishes to do. That turns into a legal question. Did he have to do that? That turns into a legal issue. Did he have to specifically identify a space that he wanted? Or could he just, or just that it was apparent that he needed a space other than the one he had? I don't know that it becomes apparent that someone needs another parking space when the only evidence of that is simply that they are parking in an unassigned spot in violation of their lease agreement, the parking agreement, and the house rules that they agreed to abide by. No, so is Mercy Hospital's ultimate position that it didn't realize that he needed or wanted a more accessible space? Is that ultimately the defense? Ultimately, Your Honor, at the time, Mercy Housing had every reason to believe that the parking spaces assigned to Mr. Green that he viewed before he signed his lease agreement were accessible. They did have reason to believe that he wasn't using them, but did not know why. There is no evidence in the records that they knew why he was not parking there. And as the record does show, it wasn't just Mr. Green that wasn't parking in his assigned spaces. It was also his sons. Well, he says in his declaration that he spoke to Evelyn Singh and notified her that he was disabled and showed her his disability parking placard and showed her that he used a cane and requested that he be provided accessible parking. This is paragraph six. Yes, Your Honor. And it is Mercy Housing's contention that all of those things occurred before Mr. Green actually became a tenant at the property during the tour of the property. So, yeah. So they were unnoticed. Mercy was unnoticed. He needed accessible parking. What did Mercy Housing do about that? They provided him with the two closest parking spots available to his unit. And his argument or his contention is that that was not a reasonable accommodation and that there was something more that Mercy Hospital could do. I understand the argument, Your Honor, but I believe that in this situation, which is slightly different than the Code of Federal Regulations fact pattern cited by appellant in the moving papers, here, resident parking is assigned in one area, visitor parking is assigned in another. Mercy Housing provided Mr. Green with the accessible spot. So that's, so even you're reciting this rule, it's so inflexible. And the whole thing about disability law is that there needs to be a reasonable accommodation. Why would it be unreasonable to maybe renegotiate with First Baptist who I understand was paying $1 a year or it's $1 a month for its lease, renegotiate and get him a space that's closer? Or why not make an additional visitor parking space further away because not all visitors are disabled. And I can think of all sorts of reasonable steps that could have been taken in this instance that obviously were not for some reason. Well, your honor, but the Fair Housing Act does not require Mercy Housing to fundamentally change or alter the nature of its program. In other words, where the resident parking is, visitor parking or to renegotiate a business relationship with a third party. Program, I mean, that's not an answer. That's not a program. Certainly you could, I mean, a reasonable accommodation be marking spaces differently. I mean, otherwise you're just saying you have to do anything if there were seven, we don't know how many, I think there were six visitor spaces. Do we know that they were even taken? There are four. There were four and we know that they were taken or that they couldn't just take one of those and give them to him? Or they couldn't have put another one in the same space? I don't know, we don't know. Well, I have, the appellate has cited no case law and I am not aware of any that requires Mercy Housing to redraw the preexisting parking spaces in its lot. And again, your honor, respectfully, it is undisputed that Mr. Green viewed the parking spaces, signed the lease agreement and in doing so, communicated to Mercy Housing that they were in fact accessible and did not then subsequently ask for different parking spaces. Even if he had, none became available. Okay, do you want to address the most discrimination issues? Yes, thank you, your honor. Appellant did not produce any admissible evidence in the court below that he was treated differently with respect to the terms and condition of his housing because of his race. To establish a prima facie case, he was required to demonstrate that, for example, other non-African American tenants were subjected to, for example, the late payment notices or were permitted to violate the terms and conditions of their lease agreement and did not receive, for example, a 60 day notice to terminate. He did not do so. And because he did not do so, he did not establish the prima facie case. Mercy Housing additionally produced evidence that stands undisputed, that despite the unquestionably offensive statements that Ms. Singh is accused of making, at the same time, she was not the sole decision maker with respect to the 60 day notice or even for the eviction. And additionally, along the same timeline when she was accused of making these statements, Ms. Singh was also actively assisting Mr. Green in securing third party funding to cover his rent. She, supervised by additional employees at Mercy Housing, negotiated the terms and agreements of the continued tenancy, which rescinded the December 4th, 2017, 60 day notice to vacate. And she, in fact, then in June of 2018, accepted Mr. Green's requests for an extension of time to pay his rent. She did so. And these are not the acts of someone who is acting with discriminatory animus. Additionally, the remarks themselves and on these facts, the remarks themselves cannot be construed as implicating the decision making process. All of the decisions that implicated Mr. Green, the 60 day notice, were reviewed by Ms. Singh's superiors and supervisors. There is no evidence that her racial animus- Regarding the material about his son, Elijah. You know, I don't think that's a strong claim in terms of the AGA, but all the information that supported the contention that Elijah was A, living there, and B, doing illegal things on the property and so on, was all from Ms. Singh. So the fact that other people, given that information by Ms. Singh, went along with the decision isn't very useful in terms of whether those perceptions were influenced by her, by what one believes these statements being made by her attitude towards black people in general. They're not the strongest evidence in the world. I mean, it's, you know, so-and-so told me such and such. I saw him, she claims that he did something illegal that called the police, but it was actually the woman who was arrested, not him. And she says that he was, somebody said that they saw him do an illegal drug deal. We don't know who, we don't know what the evidence was. And she says she thought she saw them smoking marijuana, but when she went there, there was no odor of marijuana. So it's, you know, it's not exactly, and he insists that he wasn't living there. In fact, he knew he was there, but he said he wasn't living there. And so one could put together everything that at least was being said about Elijah and say that it was being influenced by her attitude towards black people. Well, Your Honor, it could also just as easily be construed as Mercy Housing's attempt to enforce the rules of its property with respect to- That was just a two-edged knife on summary judgment. I beg your pardon? That would lead to a denial of summary judgment. The fact that there are two ways to look at the same thing. Well, Your Honor, so again, with respect to Elijah, the plaintiff did not establish that other people who were not African-American were subjected to or experienced a different set of rules. In other words, that a different class of people were permitted to have their other children live there. Yeah, but the question isn't the rules. The question is whether her beliefs about this person were being influenced by her beliefs about black people. I understand the question, Your Honor. But again, in context and in context of all of the other things that Ms. Singh did to assist and facilitate Mr. Green with keeping his housing, finding him additional coverage for his rent payments, agreeing to the continuance of tenancy following the 60-day notice, those are not the acts of someone who is experiencing racial animus. Those are the acts of somebody who is attempting the best of their ability to enforce Mercy Housing's rules and procedures while also making sure that Mr. Green keeps his housing. It is possible, even probable, I'd say probable, that if Ms. Singh went to trial, it's perhaps unlikely Mr. Green would prevail on this claim. But the problem is that given the allegations as to the statements and the fact that she took detrimental action against him with regard to the son, I'm pretty frenzied. Why isn't that enough to support her to be able to send her child home? Thank you, Your Honor. Again, I would respectfully submit that Plaintiff Appellant did not establish the requisite prima facie case demonstrating that he was treated differently. Statements alone aren't sufficient. I mean, there's no proof of disparate treatment, but it doesn't have to be disparate treatment. It doesn't have to be. It could be treatment that was because he was black, and there is no comparison. There is nobody else to compare him to. Under a disparate treatment theory, Your Honor, I would submit that the statements could be evidence of pretext, but that he did not establish a prima facie case so we don't get there. With respect to- I'm not conceding that you're applying the McDonnell-Beckler standard for proof, but if you instead are simply saying this person, Harvard racial animus, how do I know that her statements? And she, because of that, she perceived Elijah Green as having all these characteristics which don't prove up. That's the pretext. That, why isn't that good enough? Your Honor, again, it's not good enough because there is no evidence that Ms. Singh's alleged racial animus, in fact, influenced the decisions to issue the 60-day notice. Again, that was reviewed and approved by both Ms. Buchanan, who is at the property at the same time, and Ms. Singh's supervisors, all of whom happen to be African-American. All right, thank you, counsel. You're well over your time. Kabbalash, I think you have a minute left, a minute left. Thank you, Your Honor. I just wanted to briefly touch on two things if I have the time. With regards to the discriminatory statement, and I don't believe it needs to be analyzed under the McDonnell-Douglas standard. I think it just falls just on its face whether or not the statement is openly discriminatory, and it just has to be treated straightforward. And this court in Harris v. Itaki, that's 183 F. 3rd, 1043, basically just looked at the discriminatory statement and said, look, there's a dispute, not as to whether or not the statement's discriminatory on its face. The only real issues in this case is whether or not it was being made by the agent or the defendant, and whether or not it's a stray remark, or if it's made with respect to the decision. But it still has to either hook up with some decision or be sexual, be racial harassment in its own court. Right, Your Honor, and what we're alleging- Which way are you contending? You're not making a racial harassment complaint, as I understand it. No, what we're saying is that these statements and one combined with the notice, notices to vacate, the three-day notices to vacate that are actually signed by her are enough to survive summary judgment. That's all we're saying. And we don't need to show anything else in this case. She's clearly the decision maker. Her declaration says that she is really responsible for these day-to-day things, and she's the one that serves these notices, her signature's on all of them. And with respect to costs, I mean, I think- But if, for example, it were clear that, I'll take the later decision, that he didn't pay his rent, I presume she signed that one, too. Let's assume she did. And if she, and you're not contending that because she made that decision and because she harbored animus, that decision is also in question because you're willing to accept the fact that people who don't pay their rent are gonna get evicted. So it has to be that there's some questionable or discretionary or something decision that would be infected by it, not just that there was an adverse decision. Right, so I think the court said basically that he was paying the rent on time repeatedly from this date to this date, and our contention is despite that happening, she was still serving three-day notices on him, despite him paying it within the grace period. And if you're paying the rent within the grace period, there's no justification for- She said what the justification was. She believed that he had a son who was living there who was involved in crime. That was what they did, but that's a close-up to that. I don't think you're anywhere. Well, that's with regards to the 60-day notice. The 60-day notice had nothing to do with- But the three-day notice, you're not complaining about, you told me. No, no, that's the issue here, that the court focused on the ultimate eviction, but the issue here was not the ultimate eviction. It was really these notices that were going out while he was living there and paying rent on time, and then she was making these statements. So the question- Thank you, counsel. You're well over your time, including the additional time I gave you. I think we have this case well in mind. Green versus Mercy Housing will be submitted, and this session of the court is adjourned for today. Thank you.
judges: Baldock, Wardlaw, Berzon